IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16-cr-00052-CAB |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| MOHAMMAD H. MOHAMMAD, | ) | GOVERNMENT'S RESPONSE TO |
| OMAR H. MOHAMMAD, | ) | DEFENDANTS MOHAMMAD H. |
| | ) | MOHAMMAD AND OMAR H. |
| Defendants. | ) | MOHAMMAD SENTENCING |
| | ) | MEMORANDUM |

Now comes the United States of America, by and through its attorneys, Justin Herdman, United States Attorney, and Carmen E. Henderson and Phillip J. Tripi, Assistant United States Attorneys, and respectfully submits this Response to Defendants Mohammad H. Mohammad (hereinafter, "Mohammad") and Omar H. Mohammad (hereinafter, "Omar," and together the "Defendants") Sentencing Memorandum (Doc. # 115) setting forth the United States' position regarding the sentencing for the Defendants.  For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully request sentences of imprisonment at the high-end of each Defendant's respective sentencing range.

I.      **FACTUAL BACKGROUND**

To support its sentencing position, the United States offers the following summary of the Defendants' conduct.  The United States also refers the Court to the description included in the PSR.  (Docs. # 111 at 6-14, 113 at 7-14).

A.     **Early Complaints of Food Stamp Fraud at Holy Land**

In or around 2009, the United States Department of Agriculture Office of Inspector General ("USDA OIG") along with the Ohio Department of Public Safety, Cleveland Police Department and a few other agencies identified "problem businesses" that they believed were engaging in food stamp fraud. (Sent. Tr., Doc. #87 at 38.) Holy Land was identified as one of these problem businesses because over the course of a few years, the Ohio Department of Public Safety had collected several statements from individuals who admitted to exchanging food stamp benefits for cash and other non-food items at Holy Land. (*Id.*)

B.     **Food Stamp Fraud Involving the Wahdan Brothers at Holy Land**

In or around 2010 or 2011, USDA OIG began investigating Saed Wahdan and Maher Wahdan, two brothers who operated four convenience stores in Cleveland, for allegations of food stamp fraud. (*Id.* at 39.) Through that investigation, USDA OIG learned that the Wahdan brothers and some of their employees were purchasing food stamp cards from customers at their convenience stores, including One Stop, for 50 cents on the dollar. (*Id.* at 40). After purchasing the food stamp cards, USDA OIG learned that the Wahdan brothers and their employees exchanged food stamp benefits for non-food items and cash. (*Id.* at 39). Additionally, USDA OIG learned that the Wahdan brothers and some of their employees were taking food stamp cards to stores, including Holy Land to purchase stock that was to be used at the Wahdans' businesses, including their restaurant. (*Id.* at 39-40).

Through surveillance video, USDA OIG observed the Wahdan brothers, their family members, and employees of the Wahdans using the food stamp cards they fraudulently purchased to shop at stores including Marc's, Sam's Club, and other grocery stores. (*Id.*). After learning how the Wahdan brothers were using the food stamp cards they purchased, USDA OIG,

2

along with the help of Ohio Department of Job and Family Services, developed search parameters to discover food stamp cards that were used at a Wahdan business and subsequently used at a business that USDA OIG knew the Wahdan brothers used food stamp cards. (*Id.* at 41). As a result, USDA OIG developed a list of food stamp transactions where the food stamp card was used at a Wahdan business for either a small purchase or balance inquiry and then used at a store known to be frequented by the Wahdan brothers within 24 hours. (*Id.* at 42). From this list, Special Agent Robert Springer ("SA Springer") of USDA OIG was able to identify 155 cards, containing approximately $51,000 of food stamp benefits, which were used at Holy Land within 24 hours after being used at One Stop, a Wahdan convenience store, for a small purchase or balance inquiry. (*Id.* at 42-43; Ex. 7). Additionally, SA Springer was able to determine that on many occasions multiple cards from the list were used at Holy Land within or at the same time, signifying that the Wahdan brothers or their employees used multiple food stamp cards at the same time at Holy Land. (*Id.* at 45-46; Ex. 8).

Furthermore, during interviews with USDA OIG, Saed Wahdan admitted to buying food stamp cards and directing his employees to purchase food stamp cards and then using those food stamp cards to purchase stock for his businesses. (*Id.* at 46-47). Specifically, Saed Wahdan admitted to using food stamp cards at Holy Land to purchase food for his restaurant, Layalena. (Id. at 47). Moreover, Josefina Cotts, one of the Wahdan employees, stated that she provided Saed Wahdan her food stamp card, which he used at Holy Land. (*Id.*).

### C.     Unauthorized Food Stamp Transactions with Cooperating Witnesses

After learning that the Wahdan brothers and their employees were permitted to use multiple food stamp cards to purchase food for their restaurant at Holy Land, USDA OIG directed multiple cooperating witnesses to Holy Land in an attempt to engage in fraudulent food

3

stamp transactions. (*Id.* at 48). As part of the investigation, four[1] cooperating witnesses were provided with controlled food stamp cards and audio and video recording devices. (*Id.* at 48-49). The cooperating witnesses were then sent into Holy Land to attempt to engage in unauthorized food stamp transactions. (*Id.*). Two of the four cooperating witnesses were able to conduct unauthorized food stamp transactions at Holy Land. (*Id.* at 49-50). One of the unsuccessful cooperating witnesses was only sent into Holy Land one time and did not attempt to traffic in food stamps. (*Id.* at 50). The other unsuccessful cooperating witness was unfamiliar to the Defendants and was not from the Cleveland area. (*Id.*). The two cooperating witnesses that were able to engage in food stamp fraud conducted the unauthorized transactions with five individuals at Holy Land, including the Defendants, Mohammad Mohammad, Omar Mohammad, their employees Rashid Mohammad, Alaa Mohammad, and Nader Harb. (*Id.*).

The Defendants and their employees permitted the cooperating witnesses to engage in four types of unauthorized food stamp transactions, including: (1) exchanging food stamps for non-food items such as tobacco products; (2) allowing cooperating witnesses to purchase large quantities of food with knowledge that it would be used in the witness' restaurant; (3) allowing cooperating witnesses to use multiple food stamp cards at one time; and (4) extending the cooperating witnesses credit for food stamp benefits to be used on future purchases. (*Id.* at 65, See Ex. 9). The unauthorized food stamp transactions with the two cooperating witnesses over a period of about one year led to a loss of approximately $10,101.68.

---

[1] SA Springer testified that there were five cooperating witnesses that were directed to Holy Land to engage in fraudulent food stamp transactions. However, the parties have stipulated that the transactions of one cooperating witness whose audio and video recordings were not provided to the defendants will not be discussed or relied upon for purposes of sentencing. (Sent. Tr., Doc. #89 at 220-22.)

### D. Search Warrants

As a result of the unauthorized transactions with the cooperating witnesses, USDA OIG conducted searches pursuant to search warrants at Holy Land and the defendants residences on October 15, 2014. (*Id.* at 55). During the execution of the search warrants, the agents obtained four notebooks, which contained ledgers of credit extended to customers at Holy Land, including credit extended for food stamp benefits. (*Id.* at 55, 67).

### E. Mohammad Mohammad's Admissions

In Defendant Mohammad's Written Guilty Plea, he acknowledged that "[he understood] that the [summary of facts contained therein] fairly and accurately set[] forth [his] offense conduct and a factual basis for the guilty plea." Defendant further acknowledged that "[he understood] that the facts set forth in the summary [were] true and could be established beyond a reasonable doubt if the case were to proceed to trial." (Doc. # 39 at ¶ 15.) Specifically, regarding the three money laundering charges Defendant admitted the following:

> On March 6, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, [he] did knowingly engage and attempt to engage in a monetary transaction, by, through, and to a financial institution affecting interstate and foreign commerce, in **criminally derived property of a value greater than 10,000**, that is [he] deposited, and caused to be deposited, $394,726.83…in the name of Wallbright from the sale of property…**such property having been derived from a specified unlawful activity, that is, Food Stamp Fraud**.

> On March 7, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, [he] did knowingly engage and attempt to engage in a monetary transaction, by, through, and to a financial institution affecting interstate and foreign commerce, in **criminally derived property of a value greater than 10,000**, that is [he] transferred and caused to be transferred, $150,000 via a bank cashier's check, from Wallbright, account ending in x0899 at Charter One Bank, to Wallbright, account number ending in x9898 at Charter One Bank, **such property having been derived from a specified unlawful activity, that is, Food Stamp Fraud.**

> On March 7, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, [he] did knowingly engage and attempt to engage in a monetary transaction, by, through, and to a financial institution affecting interstate and foreign commerce, in **criminally derived property of a value greater than 10,000**, that is [he] transferred and caused to be transferred, $250,000.00 via a bank cashier's check, from Wallbright, account ending in x0899 at Charter One Bank, to Wallbright, account number ending in x9847 at Charter One Bank, **such property having been derived from a specified unlawful activity, that is, Food Stamp Fraud.**

(Doc. #39 at ¶ 41-43.) (emphasis added). Therefore, Defendant Mohammad admitted in his factual basis to his Written Guilty Plea that on three separate occasions he knowingly engaged or attempted to engage in money laundering transactions involving a value of greater than $10,000 of funds derived from proceeds of food stamp fraud. Specifically, Mohammad Mohammad admitted that at least $10,001 of the wire deposit into Wallbright account 0899 came from monies derived from food stamp fraud. He also agrees that two transfers were made from the Wallbright 0899 account to the Wallbright 9847 account and the Wallbright 9898 account and that both of these transactions involved at least $10,001 of monies derived from food stamp fraud. Thus, the Defendant agreed that the March 6, 2014, $394,726.83 wire transfer included at least $20,002 of criminally derived property.

### F. Court's Findings

The Court previously rejected all of the government's fraud estimates and adopted the actual fraud loss calculation resulting solely from the Defendants food stamp fraud transactions conducted with the cooperating witnesses of $10,101.68 as the total food stamp fraud loss in this case. (Doc. 93 at 9.) After the government filed its motion for reconsideration, arguing that the Court determined loss amount was inconsistent with Defendant Mohammad Mohammad's admissions, the government and Mohammad Mohammad agreed and the Court ordered that

6

Mohammad loss amount was $30,004.72. (Doc. 104 at 6.) Additionally, the Court found that Omar Mohammad's loss amount was $10,101.68. (*Id.* at 8.)

## II. APPLICABLE LEGAL STANDARDS

A well-established legal framework guides the Court's sentencing determination. The advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an important institutional role: It has the capacity courts lack to 'base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a).

### A. Sentencing Guidelines Computation

#### 1. Defendant Omar Mohammad's Guidelines Calculation

The United States concurs with the Guidelines calculations set forth in the PSR. (Doc. #111.) Defendant Omar Mohammad's base offense level is 7 because food stamp fraud has a statutory maximum penalty of 20 years. (Doc. #111 at ¶ 61.) However, 2 levels are added because the Court found his food stamp fraud loss amount to be $10,101.68, as discussed above. (U.S.S.G. § 2B1.1(b)(1)(B).) Additionally, 4 levels are added because Defendant Omar Mohammad as the co-owner of Holy Land was a leader of the food stamp fraud conspiracy, which involved at least five participants. (Doc. #111 at ¶ 65.) The two cooperating witnesses

that engaged in food stamp fraud at Holy Land conducted the unauthorized transactions with five individuals at Holy Land, including the Defendants, Mohammad Mohammad, Omar Mohammad, their employees Rashid Mohammad, Alaa Mohammad, and Nader Harb. (Sent. Tr., Doc. #87 at 49-50.) Furthermore, 2 levels are added because Defendant Omar Mohammad abused a position of trust by engaging in food stamp fraud after becoming authorized by the United States Department of Agriculture to participate in the food stamp fraud program. (Doc. #111 at ¶ 66.); *See United States v. Kasi*, 348 F. App'x 689, 693 (2d Cir. 2009) (finding that the "case for the abuse-of trust enhancement was open and shut" where the defendant "was the person who received authorization from the USDA to participate in the food stamp program and was trained to ensure compliance with the program's requirements); *see also United States v. Sarsour*, 271 F. App'x 923, 928 (11th Cir. 2008) (finding that the abuse of trust enhancement was applicable where "[the defendant] had to receive approval from the USDA to participate in the food stamp program, and that approval allowed him to engage in food stamp fraud"). Thus, Defendant Omar Mohammad's adjusted offense level is 15. After a two-level reduction for acceptance of responsibility, Omar Mohammad's total offense level is 13. Omar Mohammad falls into Criminal History Category I. ((Doc. #111 at ¶ 75.) The corresponding Guidelines range for Defendant Omar Mohammad is thus 12 to 18 months.

    2.    <u>Defendant Mohammad Mohammad's Guidelines Calculation</u>

The United States concurs with the Guidelines calculations set forth in the PSR. (Doc. #113.) Defendant Mohammad Mohammad's base offense level for the food stamp fraud charges is 7 because food stamp fraud has a statutory maximum penalty of 20 years. (Doc. #113 at ¶ 62.) Additionally, 4 levels are added because the Court found Defendant Mohammad Mohammad's total loss amount to be $30,004. 72, as discussed above. (*Id*.); (U.S.S.G. § 2B1.1(b)(1)(C)).

8

Therefore, Defendant Mohammad Mohammad's base offense level for his money laundering offense is 11. Also, 1 level is added because he was convicted of money laundering, under 18 U.S.C. § 1957. (Doc. #113 at ¶ 63.) Additionally, 4 levels are added because Defendant Mohammad Mohammad as the co-owner of Holy Land was a leader of the food stamp fraud conspiracy, which involved at least five participants. (Doc. #113 at ¶ 65.) Furthermore, 2 levels are added because Defendant Mohammad Mohammad abused a position of trust by engaging in food stamp fraud after becoming authorized by the United States Department of Agriculture to participate in the food stamp fraud program. (Doc. #113 at ¶ 66.) Thus, Defendant Mohammad Mohammad's adjusted offense level is 18. (*Id*. at ¶ 68.) After a three-level reduction for acceptance of responsibility, Mohammad Mohammad's total offense level is 15. (*Id*. at ¶ 72.) Mohammad Mohammad falls into Criminal History Category I. (*Id*. at ¶ 78.) The corresponding Guidelines range for Defendant Mohammad Mohammad is thus 18 to 24 months. (*Id*. at ¶ 102.)

**B.      Application of § 3553(a) Factors**

    1.      <u>Nature and Circumstances of Offense</u>

This is not the first time the Defendants engaged in food stamp fraud. The Defendants were convicted of attempted trafficking in illegal food stamps in 2004. The Defendants were given a second chance after their previous food stamp fraud convictions. They were permitted to retain their authorization to participate in the food stamp program. Additionally, their previous convictions were expunged from their records. Nevertheless, the Defendants continued to participate in food stamp fraud.

The Defendants engaged in multiple food stamp fraud schemes. The Defendants and their employees permitted the cooperating witnesses to engage in four types of unauthorized food stamp transactions, including: (1) exchanging food stamps for non-food items such as

9

tobacco products; (2) allowing cooperating witnesses to purchase large quantities of food with knowledge that it would be used in the witness' restaurant; (3) allowing cooperating witnesses to use multiple food stamp cards at one time; and (4) extending the cooperating witnesses credit for food stamp benefits to be used on future purchases.  (Sent. Tr., Doc. #87 at 65.)  Moreover, the Defendants created policies in attempts to conceal their continued food stamp fraud after their first convictions.  The Defendants developed a policy to conceal their food stamp fraud when a customer wanted to use multiple cards in a transaction.  (*Id*. at 61.)  In such situations, Defendants attempted to prevent detection by running multiple food stamp cards on multiple registers so that the transactions would not produce a flag in the food stamp system for consecutive use of multiple cards on the same terminal.  (*Id*.)  Thus, the seriousness and pervasiveness of the Defendants' conduct along with their lack of respect for the law and attempts to circumvent the law warrant a maximum Guidelines sentence.

        2.       <u>History and Characteristics of the Defendants</u>

As stated above, Defendants Mohammad Mohammad and Omar Mohammad were previously convicted of attempted trafficking in illegal food stamps in 2004.  They received a sentence that did not include imprisonment and were given a second chance to participate in the food stamp program.  Additionally, their records were expunged of their previous convictions.  Clearly, Defendants' past convictions did not deter them from continuing their criminal activity.  The Defendants' behavior of continuing the same type of criminal conduct demonstrates their absence of respect for the law.  Furthermore, the Defendants involved their family and employees in their criminal conduct.  Thus, the Defendants' history and characteristics, particularly their continued food stamp fraud after their previous conviction, merit a sentence at the high end of the Guidelines.

      3.      <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment</u>

Imposing the maximum sentence within the range suggested by the Guidelines would reflect the seriousness of the Defendants' offenses, promote respect for the law, and provide just punishment. As demonstrated above, Defendants' conduct was egregious and their crimes were serious. Moreover, this is a situation where there is a serious and an obvious apparent need to impose a sentence to promote respect for the law. The Defendants were not sentenced to a term of imprisonment after their previous conviction for attempted trafficking in illegal food stamps and they continued their criminal conduct. Only a significant sentence will promote proper respect for the law and provide just punishment for their crimes.

      4.      <u>The Need of the Sentence Imposed to Afford Adequate Deterrence and Protect the Public from further crimes of the Defendants</u>.

Imposing the maximum sentence within the Guidelines range would deter the Defendants and others from engaging in food stamp fraud and tax fraud. <u>United States v. Flores-Machicote</u>, 706 F.3d 16, 22 (1st Cir. 2013) ("Deterrence is widely recognized as an important factor in the sentencing calculus."); <u>United States v. Miller</u>, 484 F.3d 964, 967-68 (8th Cir. 2007) ("general deterrence . . . is one of the key purposes of sentencing . . . ."); <u>United States v. Jackson</u>, 835 F.2d 1195, 1199 (7th Cir. 1987) (Posner, J., concurring) ("deterrence is the surest ground for punishment . . . since incapacitation may, by removing one offender from the pool of offenders, simply make a career in crime more attractive to someone else, who is balanced on the razor's edge between criminal and legitimate activity and who now faces reduced competition in the crime 'market.'").

As courts have noted, deterrence is particularly important in "white-collar crimes, because they are often perceived as carrying substantially lesser punishment than other

11

comparable offenses." United States v. Panyard, No. 07-20037-2, 2009 WL 1099257, at *12 (E.D. Mich. April 23, 2009). As the Sixth Circuit stated in *United States v. Peppel*, 707 F.3d 627, (6th Cir. 2013), "because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Peppel*, 707 F.3d at 641. The Defendants' crimes were not only rational and calculated, but they spanned many years. The Defendants had numerous opportunities to cease their criminal conduct, but instead they chose to continue and develop methods to conceal their conduct. Sentences at the high end of the Guideline ranges are necessary to deter the Defendants and the public from continuing to engage in food stamp fraud.

**C.     Restitution**

Restitution to the United States Department of Agriculture ("USDA") is directed by the Guidelines and mandated by law. U.S.S.G. § 5E1.1; 18 U.S.C. § 3663A. Thus, the United States requests that the Court order the Defendant Mohammad Mohammad to pay restitution in the amount of $30, 004.72 to the USDA and Defendant Omar Mohammad to pay, jointly and severally, restitution in the amount of $10,001.68 to the USDA.

**III.    FORFEITURE OF SEIZED PROPERTY**

The written plea agreement for Mohammad H. Mohammad contained a provision agreeing to the forfeiture of six seized bank accounts if the amount of loss exceeded the value of the accounts; otherwise, the parties agreed "to request a hearing at which the Court will determine the total amount to be forfeited." Written Guilty Plea, Doc. 39 at PageID 237. Omar Mohammad's written guilty plea contained similar language (Doc. 41 at PageID 258; however, it should be noted that he did not plead guilty to the money laundering charges. After briefing the

issue and a hearing on the matter, the Defendants agreed to forfeit $419,772.20 and the government agreed to return the remaining seized assets. (Doc. 104 at 8-9.)

IV. **CONCLUSION**

For the foregoing reasons, as well as those to be articulated at the sentencing hearing, the United States respectfully requests that this Court: (1) sentence Defendant Omar Mohammad to a maximum sentence of imprisonment within his Guidelines range of 12 to 18 months; (3) sentence Defendant Mohammad Mohammad to a maximum sentence of imprisonment within his Guidelines range of 18 to 24 months; (4) order Defendant Mohammad Mohammad to pay restitution in the amount of $30, 004.72 to the USDA; (5) order Defendant Omar Mohammad to pay, jointly and severally, restitution in the amount of $10,001.68 to the USDA; and (6) order the following properties, in the total amount of $419,772.20 forfeited to the United States:

    a.    $250,226.80 seized from Charter One Bank Account ending in number x9847, in the name of WALLBRIGHT ENTERPRISES;

    b.    $150,000.00 seized from Charter One Bank Account ending in number x9898, in the name of WALLBRIGHT ENTERPRISES;

    c.    $19,545.40 seized from Charter One Bank Account ending in number x0899, in the name of WALLBRIGHT ENTERPRISES.

Respectfully submitted,

JUSTIN HERDMAN
United States Attorney

By:   /s/ Carmen E. Henderson
       Carmen E. Henderson (OH: 0089212)
       Phillip J. Tripi (OH: 0017767)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Avenue, Suite 400

Cleveland, OH 44113
(216) 622-3967
(216) 522-8355 (facsimile)
Carmen.Henderson@usdoj.gov

Case: 1:16-cr-00052-CAB  Doc #: 116  Filed:  11/14/18  14 of 15.  PageID #: 1427

## CERTIFICATE OF SERVICE

    I hereby certify that on this 14th day of November 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

                                              /s/ Carmen E. Henderson
                                              Carmen E. Henderson
                                              Assistant U.S. Attorney